Good morning, everybody. We are here today for oral arguments. We're going to begin with appeal number 20-2598, Randall Ruenger v. Kilolo Kijakazi, and we'll begin with argument from the appellant, Mr. Duncan. May it please the court, am I allowed to? You can take that off, yes, thank you. Make sure I'm heard a little better. Dana Duncan on behalf of Randall Ruenger. The issue before the court is a narrow one. At issue is the validity of the vocational testimony provided at hearing and whether that testimony could be supportive of substantial evidence. The vocational expert was examined. She provided a methodology. However, that methodology was unclear. It could not be reproduced. The occupations cited were a composite and could not be compared against the Dictionary of Occupational Titles, specifically the residual functional capacities elements, which included a lot of non-exertional limitations. Mr. Duncan, it's nice to see you. Can I ask you a very practical question? You've done a lot of this, an awful lot. How does all of this happen as a practical matter at a hearing? Does a V.E. know before she comes into the hearing room and testifies just what the basic parameters are with the claimant? Or is it all, you know, how does it happen? I just kind of wonder, how do we find ourselves in a situation like this? The problem is that vocational experts come in with a ton of different calculations. Or they're using a computer program such as Job Browser Pro, which they bring with them. So if they don't use Job Browser Pro, they a lot of times will use the Occupational Employment Quarterly. Are they doing all this literally right there on the stand? Some. In real time? They're supposed to. According to the vocational expert handbook that Social Security provides, they're not supposed to pre-prepare anything. Yet they come in with pages and pages of notes and have tons of jobs that are light, sedentary, and medium for the most part, with numbers and calculations and all of that. So they come in almost with a preconceived notion of what they're going to provide for jobs depending on the RFC. The problem comes in is when you start having all the non-exertional impairments. I do about 300 hearings a year. My office does about another 300. And in those hearings, it is very common for us to point to the vocational expert and say things like, the job you provided requires occasional handling and fingering and the judge, or excuse me, frequent handling and fingering. The judge is limited in the residual functional capacity assessment or the hypothetical question to frequent. Oh, oh, oh, okay, then I'll replace that job. That happens about every fourth or fifth time. That's why it's so important for practitioners to know exactly what jobs were provided. In this particular case, Dr. Winkman, who is the vocational expert who I've known for 20 years, said she goes to the Department of Labor, Wage, and Earnings Statistics, and you go to food service type occupations, you go to the medical type occupations, and you would look for the name of the job that is like cafeteria attendant, then after you found all of those, you would add that number up. So she's going to all of the jobs that are like a cafeteria attendant, looking at the OEQ, the Occupational Employment Quarterly, and then adding those jobs up to come with a number. Most of the time, the number either exceeds or takes a large portion of the total amount of jobs that the Bureau of Labor Statistics has on its website for the entire Selective Occupational Characteristics category. That's how the Department of Labor gathers all this data, through the Department of Census, through questionnaires, and such, and they put it and organize it in this manner. The problem that comes into this is, why we have these problems, is because the Social Security Administration is using the Dictionary of Occupational Titles, which the Department of Labor abandoned in 1991, and the Bureau of Labor Statistics used to do their studies and all their statistics by DOT codes. They don't anymore. So what you have is, you have apples and oranges, and now you're trying to create one fruit salad, and it's a mess. Hopefully, I'm hoping that they will eventually have the system fixed, and they'll have their own categories and mechanism to assess this, but I have been hearing that since 1996. It sounds like there's no way in advance of the hearing for the V.E. to outline her methodology, because she needs to hear the hypothetical put to her from the ALJ. There should be a method that they should have for outlining their methodology. The actual numbers themselves would be difficult. Yeah, that's the part of this that it's, you know, I've got to tell you, I spent a couple hours trying to figure out what happened here. You know, how did the V.E. land upon this? And I think, why is it that the V.E. can't submit, you know, a two or three-page report outlining her methodology? You know, if you think about civil litigation and expert work, right, it doesn't need to be a 25-page report, it can just be two or three pages, but then we don't have all this briefing and all these resources spent on just trying to discern what happened. It would make it very much easier, and it would be great for judicial economy, because what ends up happening is you get an hour hearing, and you spend about 40 minutes of that examining your claimant and addressing all the limitations. You're left with 20 minutes to examine the vocational expert. If you want to delve into vocational testimony, you're going to have to either look stuff up right there and be able to cross-examine, which is very difficult. You also have the judges being very impatient at times, because they're trying to maintain a schedule, and I understand that, but I've got to try to do mine, cross-examination as well, and it's very difficult. As far as requirement that they provide this in advance, this court and its sister courts have, throughout the history of Social Security, mandated certain things. Vocational testimony only exists because this court in the 1980s, as well as its sister courts, said the commissioner could no longer use the medical vocational guidelines alone when they're having non-exertional impairments. This court and its sister courts also established the treating physician rule, which was ultimately codified in 1991 by the commissioner after the majority of the courts of appeals adopted it. So maybe that would be the easiest way so that everybody knows. I know in this particular case, I requested it multiple times. Finally, a judge out of the Madison Office of Hearings and Operations ordered Dr. Wittman to provide it. It came in well after this was briefed, but I now have in my possession- And what's the it? The methodology description? Yes. And what she does is exactly what I said, which is she takes all the numbers that pertain to it to some extent, and then adds them all together from the numbers that's provided in the OEQ, and then adds them together without any real reference to the actual numbers that the Bureau of Label Statistics provides. I have a similar practical question. One of your criticisms is that the vocational expert functionally used the equal distribution method, which courts have routinely criticized. Is that something that trickles down to vocational experts, or is this a discussion that largely exists in the bar and among the courts, or are vocational experts on notice that if they are going to use it, they need to explain it, or they need to justify their use of it? Well, what's happened is the OEQ uses the equal distribution method, and that's automatic. So if you're using that, that's automatically suspect, according to the Brace decision, and Chavez, and so they need to explain it. Now it behooves the ALJ to require that the vocational expert actually provide some information so that we can clearly see where they're coming from on that. So it is something that is utilized, and quite frankly, there are all levels of vocational experts. There are those who are very conscientious and spend a lot of time studying and preparing and have studies that they've done to show the reliability of their data, and even some that have used the equal distribution method will study it. Others, well, don't, and that's where the problem comes in, and they're on a rotation basis, so you don't know until they're assigned who you're going to get, and now with video and telephone, we're getting vocational experts from all over the country. We used to have all local within your state, so you knew what they were going to do before they got to that point. So I don't have much time left, but a few minutes or a few seconds I have left I'll reserve. Thank you, Mr. Duncan. We'll now hear on behalf of the Commissioner, Ms. Hugo. Your Honors, may it please the Court, Megan B. Hugo on behalf of the Commissioner. As we had discussed, we're here because the agency has the burden at Step 5 of providing a number of jobs, and the agency uses the Dictionary of Occupational Titles, which does not contain job numbers. So this Court has recognized this is not an ideal system, but it's what we are currently working with, and because of that mismatch, the Court has explained that providing a job number does not require meeting an overly exacting standard, and it's going to be an estimate, and it's going to be uncertain. Do we know, Ms. Hugo, whether or not Ms. Wankman meant that rather than using the total job number estimated from the SOC code, she used SOC estimates adjusted to particular industries? I believe what she did is, based on her 40 years of experience and the limitations that ALJ gave, which, as Your Honor pointed out, they do not have until the hearing. They have to do this on the fly. I wasn't at the hearing, but Mr. Duncan represented in his briefs it was a matter of minutes. This is just the reality of the situation. She says, okay, this individual, Mr. Ringer, is limited to light work, unskilled, a number of other non-exertional limitations. Okay, based on my 40 years of experience, I have seen cafeteria workers perform jobs like this. I'm going to go to the Bureau of Labor Statistics website. I know that there is cafeteria workers in the food service industry, in the medical industry. If you've had the misfortune of being in a hospital, you know they have cafeterias there. So she's not starting out with the broad number in the BLS, which is what a lot of the experts do when they whittle it down. She's starting small, based on her experience. Okay, so I don't have it broken down as it was in 2018 because the link on the website wasn't working, but if you look at the current data on the BLS, you know, for cafeteria workers, it breaks it down into smaller numbers by industry. So in elementary schools, there were 20,000 approximately cafeteria attendance in 2020. And that is the aggregate number of, you know, ranging in exertional levels. But she said, based on her experience, she knows she's seen these jobs. She's only picking jobs in industries that she's personally observed with her experience. And that's how she gets the job. She does this for every of the three broader groupings that she's looking at. She adds those numbers up, and then she compares them with the occupational employment quarterly. Ms. Hugo, let me ask you this question. How confident are you in the accuracy of what you just said? Because I've got to tell you, I looked at the transcript for over an hour, and I had the red brief right next to it. And you very well may be correct, but I don't know how to prove that from the transcript. Well, does her answer satisfy the court that she didn't make this up? I mean, I think I went on— Oh, yeah. I actually think the methodology, in fact, may be reliable. But what troubles me about this is that Mr. Duncan was, you know, objecting to it. The transcript is—I mean, to call it shorthand might be charitable. You know, you've done the best you can with it in your briefing, and I think you very well could be correct. But then we have an ALJ opinion that really doesn't join issue with the objection. And I don't know how sitting here right now I can tell you whether it's reliable or unreliable because I'm not even sure I know what happened. And I think there's—part of the problem there was really that, you know, they were sort of talking past each other, which is unfortunate. Every job is associated with an SOC code. You know, no one's disputing that. But that's just not how she looks up the jobs. So would it have been better standing here now if I could say these are all of the codes she used and these are the numbers and that's how it added up? I wish I could do that. But the Supreme Court has never said we have to do that. This court has never said that. You know, there was mention in the briefing of being able to recreate the methodology, and that is not what the Supreme Court in B.S. Tech said. The Supreme Court said even if she's relying on purely personal private labor market surveys that will not be provided, that can still be substantial evidence. So I don't think the standard needs to be, can we recreate this? It's just, does this satisfy the court that this expert, who has invoked her experience and connection with pulling these numbers and explained what she did, does that satisfy the court that these numbers are reasonable in the sense of not conjured out of whole cloth, right? And so, if the substantial evidence standard is just... I don't think we have bad faith at all. I don't think we have making it up or anything even close to that. It's just a question of does the ALJ's opinion, which really, it's really derived by treatment of the issue here, does it suffice against the backdrop of a transcript that you have to spend forever with to get to the point that you were able to get to in your red brief? But that doesn't jump off the page of the transcript. The way you were able to come up with that in your red brief, I'm confident it's by spending hours with it. I went on the website. I mean, I don't do this. I'm not, you know, I don't question them. No, I know, but you're not. But I went, I said, okay, she's going on Labor Department data, and she says she does it by industry. Well, you click around. Oh, there it is. It's broken down by industry, and it's broken down by this. You know, I think the part of the reason we have experts, the entire reason at this step is because, you know, the ALJ is not an expert in job numbers. The agency recognized it needed someone that was an expert in the numbers. No, I get that, but we got to conduct judicial review of it. Right, and the substantial evidence standard is low. It's a low bar. It's more than mere scintilla. Could the ALJ, a reasonable ALJ, have accepted this testimony? And I think even if you don't go, you know, to the finer detail that I just explained here, broadly, she said she compared numbers from two sources to ensure the reliability of the numbers. One of them is the Occupational Employment Quarterly, which this court has recognized vocational experts commonly use, and the other set was based on government data that I think essentially every vocational expert uses because that's how the data is collected of the jobs that currently exist in the economy, combined with her experience, which the court has consistently said is sufficient. You know, it's not okay if the expert just says, oh, my experience, because that kind of goes to qualifications, but if the expert ties their qualifications and experience to actually pulling those numbers, the court has suggested that that should be sufficient. So I do understand this is not as clear as it could be, especially for someone that's not, you know, in the weeds doing it. I don't do this either. But I think from a high level, the fact that she had two data sets, she told us what the data sets were, she told us how she compiled one of her data sets based on her experience, compared them, you know, to ensure reliability, I think that should meet the, you know, more than a mere scintilla threshold to show that these jobs, which are not uncommon jobs, I mean, I know that this isn't the standard we're looking at here, but as a practical matter, do we think that there really are only isolated cafeteria, tenant and packager and office helper jobs? You know, these aren't the type of jobs that the court has criticized in the past as being obsolete. Do you know where the agency's at or where the commissioner's at in the project to replace the DOT? Yes. So unfortunately, I'm sure the court's aware we had attempted to get this done by 2020, and as of the most recent printout, we're still on a five-year data gathering exercise, which I believe began in 2018. So they're hoping to roll it out. The whole project started in 2008. So, yeah, I think it's got more complicated now in the most recent material I looked at, they realized that they're going to need to promulgate new regulations, which is going to take, you know, time, obviously. So it's unfortunate. I wish we weren't dealing with this, but it is in progress. It's important to get it right, and, you know, we're collecting data. They know what they need to do now, and it's underway. Unless the court has further questions, I would just respectfully request that you affirm the court's decision, District Courts. Thank you, Ms. Hugo. Mr. Duncan, we'll give you a minute. Just three brief points. The issue is the recreatability, okay? It should not be difficult for somebody, and I do do this. I teach classes on how to cross-examine vocational experts, and I can't figure it out. I don't know where she's coming up with her numbers. That's why I'm so passionate about this appeal, because I don't know. I can't figure it out. The idea, too, that Dr. Winkman has 40 years of experience. She does in job placement, not in statistical analysis or providing numbers of jobs in the national economy. That she doesn't have the level of experience, and I find it fascinating that vocational experts change their pattern or methodology on a regular basis when they get challenged, because they realize that their methods are not really clear. Lastly, I'd just point out that cafeteria worker and office helper, the limitation was to occasional public contact. What office worker or office helper and cafeteria worker has only contact with the public or co-workers one-third of the day? Thank you, Mr. Duncan. Thank you. The case will be taken under advisement.